NOT DESIGNATED FOR PUBLICATION

No. 112,755

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

WESLEY G. COPELAND SR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Chautauqua District Court; ROGER GOSSARD, judge. Opinion filed July 27, 2018. Affirmed.

*Sal Intagliata* and *Kathryn Stevenson*, of Monnat & Spurrier, Chtd., of Wichita, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., BUSER and GARDNER, JJ.

PER CURIAM: Wesley G. Copeland Sr. appeals his convictions of one count of aggravated assault, one count of unlawful manufacture of a controlled substance, multiple counts of drug possession and unlawful possession of drug paraphernalia, and multiple counts of criminal use of a weapon. Copeland argues that the district court (1) erred in denying his pretrial motion to suppress his statements; (2) committed structural error by granting a trial continuance outside of his presence without holding a hearing; and (3) committed structural error in instructing the jury. We find no reversible error and affirm the district court's judgment.

1

FACTUAL AND PROCEDURAL BACKGROUND

On February 6, 2012, at about 8 a.m., Sedan Police Chief Cash Kimple spoke with Dana Clanton, also known as Dana Copeland. Dana stated that earlier that morning she and her boyfriend, Copeland, were arguing and Copeland became physically violent with her. She stated that she went into her 10-year-old daughter's bedroom to console her. Dana stated that after she laid down next to her daughter, Copeland came into the room and pointed a gun at her. Dana became frightened for herself and her daughter's life. Dana told Kimple that she wanted Copeland out of her home but he refused to leave.

Dana also stated that Copeland was acting paranoid—that he was walking around the house armed with a gun; checking the doors, windows, and under the bed; and he had not eaten or slept for three to four days. Based on the description of Copeland's behavior, Kimple asked Dana if he was using bath salts or methamphetamine. Dana told Kimple that she believed Copeland was using methamphetamine based on his paranoid behavior.

Kimple advised Dana to get a protection from abuse (PFA) order against Copeland and not return to the house. Dana's handwritten PFA petition was consistent with her initial statement to Kimple. Dana also spoke with Kimple and Chautauqua County Sheriff Perry Russell after obtaining the temporary PFA order. Her statements were consistent with her initial description to Kimple of the altercation with Copeland and Copeland's behavior. She gave the officers more information about the firearms Copeland had in the house. Dana stated that she believed, but was not entirely sure, that there was methamphetamine in the house. She stated that she had recently bought Sudafed—that contains pseudoephedrine, a drug compound used in manufacturing methamphetamine—that had disappeared. Dana told the officers to use the back door when they went to the house to serve Copeland with the temporary PFA order because Copeland may be sleeping in the master bedroom and would not hear them at the front door.

2

Later that day, Kimple and other law enforcement officers went to the house to serve Copeland with the temporary PFA order. The officers used the back entrance and could see Copeland lying on a bed through the glass door. The officers knocked on the door and eventually Copeland told them to come in. Kimple stated that when he entered the house he noted that there was an Uzi submachine gun on the bed and two rifles up against the wall in the bedroom. After Copeland was helped out of bed, Kimple saw a Springfield .45 caliber pistol next to where Copeland was lying. Kimple served Copeland with the PFA order and arrested him for an aggravated assault against Dana.

During the search of the house, Deputy Richard Newby collected many firearms; parts used to make a firearm automatic; and a tactical vest, computer case, and cabinet containing boxes of bullets. In the master bedroom—where Copeland was found earlier—officers located an Uzi submachine gun; two AR-15 rifles, one of which was modified to become an automatic weapon; and a pistol lying on or near the bed.

The officers found a plastic bag containing white pills marked "M358" on a counter in the utility room. Jeff Ryder, a Kansas Bureau of Investigation forensic scientist, later tested and identified the pills as hydrocodone. Officers also found a pill bottle in the master bedroom labeled "Hydrocodone" that had the personal identification information ripped off. Ryder tested the pills inside the bottle and identified various prescription medications, which included hydrocodone pills. The officers also found a red metal can in the utility room that contained several burnt cigarettes. In Wesley Copeland Jr.'s (Copeland's adult son) bedroom, the officers located a cigarette box that appeared to contain one hand-rolled cigarette and a multicolored smoking pipe. Ryder testified that the cigarette tested positive for marijuana and his tests on the smoking pipe detected tetrahydrocannabinol, a psychoactive ingredient in marijuana.

The officers located various ingredients and tools used to manufacture methamphetamine. Cedar Vale Police Chief Wayne Cline assisted in the investigation

3

due to his training and experience in investigating clandestine laboratories. The officers found a torn up lithium battery, coffee filters, many empty pseudoephedrine blister packs, and a methamphetamine gas generator. They also found syringes and several spoons containing an unknown substance. Ryder later tested and identified the substance on the spoons as methamphetamine and pseudoephedrine. Cline stated that based on his experience, the gas generator had been used within the last few days.

Newby testified that he conducted a computer search on the National Precursor Law Exchange and Oklahoma Drug Tracker System. The systems track individuals' purchases of medication containing pseudoephedrine and revealed that Copeland had made many purchases in Kansas and Oklahoma between October 2011 and January 2012.

On February 17, 2012, the State charged Copeland in case No. 12CR6 with one count of aggravated assault and one count of domestic battery for the incident involving Dana. On April 16, 2012, the State charged Copeland in case No. 12CR13 with one count of unlawful manufacture of a controlled substance; three counts of unlawful possession of drug precursors or paraphernalia; one count of possession of methamphetamine; one count of possession of hydrocodone; one count of possession of marijuana; one count of possession of drug paraphernalia; and five counts of criminal use of a weapon. The State later dismissed one of the counts of criminal use of a weapon.

In June 2013, Copeland filed a motion to suppress statements he made to Kimple during the booking process and to Officer Lee Coate during his transportation to the jail. Copeland argued that the statements should be suppressed because he had invoked his right to counsel and did not voluntarily, knowingly, and intelligently waive his rights.

In February 2014, the district court held a hearing on the motion to suppress. Kimple testified that he read the *Miranda* warnings to Copeland when he was arrested at his residence on February 6, 2012, and Copeland invoked his right to remain silent.

4

Copeland was booked into jail a short time later, and the State admitted a transcript of the booking process because the video recording had some audio and visual problems. The transcript of the booking interview begins with Kimple asking Copeland his birthdate, driver's license number, and whether he had any other prescription medication other than "Lortabs." Copeland stated in response to the prescription medication question: "There should be pot and . . . meth." This response prompted Kimple to again read the *Miranda* warnings to Copeland, and he again invoked his right to remain silent. Later in the booking process the following exchange occurred:

> "[Kimple]: Okay. You got some weapons in [the house] you're not supposed to?
> "[Copeland]: I think—that's my father's.
> "[Kimple]: Yeah.
> "[Copeland]: And, you know, years ago and I just (inaudible)—
> "[Kimple]: Okay. Okay. Like I said, I can't get you an attorney that—judge—
> "[Copeland]: I understand."

Kimple admitted at the hearing that when he asked Copeland about the weapons at the house, the question did not relate to the booking process. After the question about the weapons, Kimple left the room. Then, the following exchange occurred:

> "[Copeland]: Is Cash [Kimple] standing there?
> "[Unidentified male]: No.
> "[Coate]: You want him?"
> "[Copeland]: Please.
> "[Coate]: Hey, Cash?
> "[Kimple]: Yes, sir.
> "[Copeland]: I would really appreciate a cigarette. And so you know, the—the meth I used, I made.
> "[Kimple]: Oh, okay. Okay.
> "[Copeland]: I take responsibility for it."

Coate also testified at the hearing that he transported Copeland to the Elk County jail. Coate stated that he did not ask Copeland any questions during the transport. But Coate testified that Copeland told him during the transport that there was hydrochloric acid underneath a plastic bucket in the tool room in the basement and that there was marijuana in Wesley Jr.'s bedroom.

After hearing the evidence, the district court denied suppression of Copeland's statements made to Coate during his transport, finding that the statements were voluntary and not the result of questioning. The district court later denied the motion to suppress Copeland's statements made during the booking process. The district court found that Kimple's question about the weapons at the house was a routine booking question. As for Copeland's statement expressing responsibility for the methamphetamine, the district court found the statement was voluntary and not the result of a question by Kimple.

In July 2014, the State brought Copeland to trial before a jury. Dana testified at trial that her prior statements about Copeland becoming physically violent with her were lies, but she stated that Copeland did point a gun at her on February 6, 2012. The State admitted a video recording of Wesley Jr. talking with Undersheriff Nick Reed in February 2013. In the video, Wesley Jr. stated that he knew Copeland was cooking "dope" at the residence. But Wesley Jr. testified at trial and disputed the statements he made in the video interview with Reed. Wesley Jr. testified that he made the statements because he wanted to strike a deal with the State in his own criminal case. Wesley Jr. also testified that about 80 percent of the items in the basement belonged to him.

The jury found Copeland guilty of all charges, except the jury acquitted him on the charge of domestic battery. In September 2014, the district court sentenced Copeland in both cases to a controlling term of 162 months' imprisonment. Additional facts will be discussed to address the issues. Copeland timely appealed.

Copeland first argues that Kimple violated his right to counsel during the booking process when he asked Copeland whether he had weapons that he should not have in his home. Copeland argues that because his rights were violated here, all later statements he made to law enforcement officers required suppression because substantial evidence does not support that he validly waived his *Miranda* rights.

"When reviewing a motion to suppress evidence, the factual underpinnings of the district court's decision are reviewed for substantial competent evidence and the ultimate legal conclusion is reviewed de novo." *State v. Cleverly*, 305 Kan. 598, 604, 385 P.3d 512 (2016). "Substantial competent evidence is legal and relevant evidence a reasonable person could accept to support a conclusion." *State v. Bird*, 298 Kan. 393, 399, 312 P.3d 1265 (2013). An appellate court "normally gives great deference to the factual findings of the district court. The appellate court does not reweigh evidence, assess the credibility of witnesses, or resolve conflicts in evidence. [Citations omitted.]" *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015).

The parties do not contest the district court's findings that Copeland invoked his right to counsel. Nor do the parties dispute that Copeland was in custody during the booking process and the transport to Elk County Jail. Instead, the issue is whether Copeland was subject to a custodial interrogation when he made the statements.

Law enforcement officers need not administer *Miranda* warnings before questioning every person; but the procedural safeguards are triggered when a person is both "(1) in custody and (2) subject to interrogation. A custodial interrogation is defined as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way.' [Citations omitted.]" *State v. Warrior*, 294 Kan. 484, 496, 277 P.3d 1111 (2012).

*Did Kimple interrogate Copeland during the booking process when he asked Copeland whether he had illegal weapons at his house?*

In *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), the United States Supreme Court explained that an interrogation as conceptualized in *Miranda v. Arizona*, 384 U.S. 291, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), "must reflect a measure of compulsion above and beyond that inherent in custody itself." The Court held that an interrogation occurs "whenever a person in custody is subjected to either express questioning or its functional equivalent." 446 U.S. at 300-01.

In *State v. Garcia*, 233 Kan. 589, Syl. ¶ 6, 664 P.2d 1343 (1983), the Kansas Supreme Court held that the routine gathering of background biographical information for booking purposes from an accused after he or she had asserted their right to remain silent or right to counsel does not constitute a custodial interrogation under *Innis* and *Miranda*. In *Garcia*, the defendant argued that a detective violated his right against self-incrimination and right to counsel when he asked questions from a "personal history sheet," which included his name, address, physical description, description of his car, names and addresses of relatives, prior arrests, and his parole officer. 233 Kan. at 602-03. In sum, the court held that the five-minute interview did not constitute an "interrogation" under *Miranda* and *Innis* because "none of the questions asked were designed to, nor in actuality did, elicit any information concerning the crime charged or the appellant's involvement in the crime." 233 Kan. at 607.

Copeland asserts that the district court erred in denying his motion to suppress because his rights were violated when Kimple asked whether he had any weapons that he was not supposed to have in his home. We agree. The district court improperly classified Kimple's question about the weapons in Copeland's home as a routine booking question. The question was not helpful in identifying or processing Copeland into jail or for assessing available pretrial services. Also, it had the effect of eliciting an incriminating

8

response about Copeland's involvement in the crimes charged because Copeland was arrested for aggravated assault based, in part, on Dana's statements to Kimple that Copeland pointed a gun at her. Thus, the district court erred in denying Copeland's motion to suppress the question and response about weapons in Copeland's home.

A district court's erroneous admission of statements made in violation of a defendant's Fifth Amendment rights is subject to the constitutional harmless error review. *State v. Salary*, 301 Kan. 586, 607, 343 P.3d 1165 (2015). So to find the error harmless, "this court must be persuaded beyond a reasonable doubt that there was no impact on the trial's outcome, i.e., there is no reasonable possibility that the error contributed to the verdict. As the party benefitting from the error, the State bears the burden of proving the error was harmless. [Citations omitted.]" 301 Kan. at 607.

We agree with the State that the district court's failure to suppress the weapons-related question and response was harmless because the evidence about the weapons was properly admitted based on the lawful search of the home. In other words, because the State properly admitted evidence about the location and the possession of weapons in the lawful search of the home, there was no reasonable possibility that the error in admitting Copeland's statement about the same weapons affected the outcome of the trial. Also, though the question was improper, Copeland's response did not reveal any incriminating information. Instead, Copeland responded that any illegal weapons in the house related in some way to his father.

*Did Kimple's improper question render all of Copeland's later statements inadmissible?*

Copeland argues that because Kimple violated his right to counsel in asking the weapons-related question, all statements made after that violation should be suppressed. In particular, Copeland made a brief statement to Kimple at the end of the booking

process in which Copeland took responsibility for making the methamphetamine. Copeland also made statements to Coate during his transport to the jail.

Generally, when a defendant invokes his or her right to counsel during a custodial interrogation, "all statements made after the invocation of the right must be suppressed." *Salary*, 301 Kan. at 604. But Copeland's argument assumes that he was subject to an "interrogation" when he made the statements to the police. As the district court found, Copeland's later statements were voluntary and not the result of police questioning.

We agree with the district court that Copeland's statement taking responsibility for the methamphetamine was voluntary and was not the result of police questioning. The record reflects that the booking process had ended and Kimple had left the room. Then, Copeland called for Kimple to return to the room so he could ask for a cigarette. Kimple did not ask a question before Copeland made the statement about the methamphetamine. Although Copeland previously had invoked his right to counsel, he waived that right and voluntarily made a statement to Kimple about the methamphetamine without being subjected to express questioning or its functional equivalent. Kimple's prior improper question about the weapons did not render Copeland's later statement inadmissible.

During his transport to the Elk County Jail, Copeland told Coate that there was hydrochloric acid in the basement of the house and that there was marijuana in Wesley Jr.'s bedroom. The district court found that Copeland was not subject to an interrogation when he made the statements to Coate. We agree. Substantial evidence supports a finding that Copeland waived his right to counsel in making the statements. Coate testified at the hearing on the motion to suppress that he did not question Copeland when he moved him from the booking room to the vehicle and that the only conversation during the transport was Copeland's voluntary statements. The district court did not err in admitting the statements Copeland made to Coate during his transport to jail.

10

Finally, in discussing harmless error, Copeland briefly argues that his assertions of his right to counsel were improperly admitted at trial. These statements were not included as part of Copeland's pretrial motion to suppress. Generally, a point raised incidentally in a brief and not argued therein is deemed abandoned. *State v. Sprague*, 303 Kan. 418, 425, 362 P.3d 828 (2015). More importantly, we cannot consider whether there was error in the admission of these statements because there was no contemporaneous objection to these statements at trial. See K.S.A. 60-404. Thus, any issue relating to the admission of Copeland's invocation of his right to counsel is not preserved.

TRIAL CONTINUANCE OUTSIDE OF COPELAND'S PRESENCE

For the first time on appeal, Copeland argues that the district court violated his right to be present at a critical stage of his trial when it issued a written order, without holding a hearing, which delayed his trial and granted the parties' agreement to strike the trial from the docket. Copeland argues that this violation amounted to structural error requiring the reversal of his convictions.

Criminal defendants charged with a felony have a constitutional and statutory right to be present at all critical stages of their trial. U.S. Const. amend. V, VI, and XIV; Kan. Const. Bill of Rights, § 10; K.S.A. 2017 Supp. 22-3405(a); *State v. Davis*, 284 Kan. 728, 731, 163 P.3d 1224 (2007). Whether a defendant's right to be present at a critical stage of the trial was violated presents a question of law subject to unlimited review. *State v. Wright* (*Wright I*), 305 Kan. 1176, 1178, 390 P.3d 899 (2017).

"Generally, a theory not asserted before the trial court—even an issue raising a constitutional question—cannot be raised for the first time on appeal. [Citations omitted.]" *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014). The Kansas Supreme Court recognizes three exceptions to this general rule:

11

"(1) The newly asserted theory involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and (3) the district court is right for the wrong reason. [Citations omitted.]" 299 Kan. at 493.

Copeland asserts that the first two exceptions apply. Because we agree that at least the second exception applies here, we will consider this claim for the first time on appeal. See *State v. Knighten*, 51 Kan. App. 2d 417, 427, 347 P.3d 1200 (2015) (defendant's right to be present at all critical stages of trial addressed by court for first time on appeal).

*Additional facts*

Copeland was arraigned in both cases (12CR6 and 12CR13) on May 16, 2012, while in custody. On October 10, 2012, the district court consolidated the two cases. At that time, defense counsel had requested a continuance, and Copeland's speedy trial clock was tolled. On January 23, 2013, Copeland's counsel requested another continuance and agreed to a trial date of June 24, 2013. But defense counsel also placed the State and the court on notice that Copeland wanted to have the case tried "as soon as possible."

Five days before the June 24, 2013 trial date, the district court found that another continuance was necessary because material evidence was unavailable at that time. The district court rescheduled the trial to August 5, 2013.

Meanwhile, on July 8, 2013, Copeland posted a surety bond and was released from custody. On July 29, 2013, Copeland's attorney filed a request for another continuance to review newly discovered evidence. At a hearing on July 31, 2013, Copeland waived his speedy trial rights to allow his counsel time to review the evidence, and the district court rescheduled the trial for January 6, 2014.

However, on November 12, 2013, counsel for the State requested a continuance because he had surgery and would be unavailable for the January 6, 2014 trial date. Without holding a hearing, the district court granted the continuance "by agreement of the parties" and removed the trial from the court's calendar. The court later rescheduled the trial to begin on May 12, 2014.

On March 28, 2014, the State successfully argued a motion to revoke Copeland's bond, and Copeland was placed back in custody on April 1, 2014. The district court again continued the trial on May 12, 2014. Copeland remained in custody until his trial began on July 10, 2014, and he was also facing a charge in Chautauqua County case No. 14CR18 for violating a protection order.

*Did the district court err by granting a trial continuance outside of Copeland's presence?*

The Kansas Supreme Court first addressed a defendant's right to be present at a continuance hearing in *State v. Brownlee*, 302 Kan. 491, 354 P.3d 525 (2015). In that case, defense counsel requested and was granted a continuance at a pretrial hearing without the defendant being present at the hearing, and the continuance was assessed to the defendant for speedy trial purposes. 302 Kan. at 494. The defendant later objected to the continuance and argued that his statutory speedy trial right was violated because the court erroneously assessed the continuance to the defendant. 302 Kan. at 507. The defendant argued that his statutory and constitutional right to be present at all critical stages of the proceedings had been infringed because he was not given the opportunity to object in person to the critical continuance. 302 Kan. at 507.

Our Supreme Court ultimately held that the failure to allow the defendant to be present at the continuance hearing was error under K.S.A. 2014 Supp. 22-3208(7), and the defendant did not acquiesce in the continuance sought by defense counsel at the hearing, so the delay caused by the continuance should not have been counted against the

defendant for statutory speedy trial purposes. 302 Kan. at 508. But the court went on to hold that under K.S.A. 2012 Supp. 22-3402(g), the Legislature, which created the statutory speedy trial right in the first place, eliminated the remedy for its violation in certain circumstances when a delay initially attributed to the defendant is later charged to the State for any reason. 302 Kan. at 509-11. Thus, the defendant was denied any relief for the violation of his right to be present at the hearing. 302 Kan. at 511.

Next, in *State v. Dupree*, 304 Kan. 43, Syl. ¶ 2, 371 P.3d 862 (2016), the court reaffirmed its holding in *Brownlee* that a district court errs when it grants a defense counsel's request for a trial continuance outside the defendant's presence:

> "'Under the plain language of K.S.A. 22-3402, a continuance resulting from a defendant's request stays the running of the statutory speedy trial period. When the request is made by defense counsel, the request for continuance is attributable to the defendant unless the defendant timely voices an objection. Because a defendant's disagreement matters in a statutory speedy trial analysis, a defendant must have an opportunity to be present to express that disagreement."

But like in *Brownlee*, the *Dupree* court held that under K.S.A. 2014 Supp. 22-3402(g), the Legislature eliminated the remedy for a violation of the speedy trial statute in certain circumstances when a delay initially attributed to the defendant is later charged to the State for any reason. 304 Kan. at 50-51. The court went on to hold that K.S.A. 2014 Supp. 22-3402(g) does not create a vested right to dismissal, so the defendant was not entitled to any relief for the violation of his right to be present at the continuance hearing even though his statutory speedy trial rights would have otherwise been violated before subsection (g) went into effect. 304 Kan. at 57.

In *Wright I*, 305 Kan. at 1178, the defendant again argued that his statutory and constitutional right to be present at every critical stage was violated when his attorney

14

requested and received a trial continuance outside of his presence which affected his statutory speedy trial right. After briefly discussing its rulings in *Dupree* and *Brownlee*, the court stated: "We have no hesitance in ruling that [the defendant's] right to be present at all critical stages of his trial was violated." 305 Kan. at 1178. But this time, the court found that it was necessary to remand the case to the district court for factual findings to permit the Supreme Court to determine whether the violation of the defendant's right to be present amounted to harmless error. 305 Kan. at 1179-80. Specifically, the Supreme Court ordered the district court to make factual findings on "'whether [the defendant's] presence would have made any difference in the decision to grant the continuance.'" *State v. Wright* (*Wright II*), 307 Kan. 449, 451, 410 P.3d 893 (2018).

On remand, the district court conducted an evidentiary hearing where counsel and the judge who presided over the continuance hearing testified. After hearing the evidence, the district court found that even if the defendant had been present at the continuance hearing, the district court would have granted the continuance and charged the time to the State, but the State would have still brought the case to trial within the statutory deadline. 307 Kan. at 452. Based on these findings, the Supreme Court found that the violation of the defendant's right to be present at all critical stages was harmless error. 307 Kan. at 458. In a concurring opinion, two justices stated that they disagreed with the some of the majority's conclusions on harmless error but pointed out that because the defendant was only asserting a violation of his statutory speedy trial right, as opposed to a constitutional speedy trial question, the district court's findings did not matter anyway because of the effect of K.S.A. 2013 Supp. 22-3402(g) and the court's interpretation of that provision in *Brownlee*. *Wright II*, 307 Kan. at 461-62 (Johnson, J., concurring).

Returning to our facts, the issue here differs somewhat from the continuances granted in *Brownlee*, *Dupree*, and *Wright* where defense counsel requested and was granted a continuance at a hearing outside the defendant's presence. Here, the record reflects that the continuance was based on an agreement between the parties and was

15

granted in a written order. But the law in Kansas is clear that the granting of a trial continuance is a critical stage of a criminal proceeding, requiring the defendant's presence. Because the district court granted the trial continuance outside of Copeland's presence, we agree with Copeland that the district court's action violated his right to be present at a critical stage of the proceedings.

*The district court's error was not structural.*

Copeland argues that the district court's error in granting the trial continuance in November 2013 outside of his presence amounted to structural error requiring the reversal of his convictions. An appellate court's consideration of whether an error is structural or whether it may instead be declared harmless is a question of law over which appellate courts have unlimited review. *State v. McDaniel*, 306 Kan. 595, 600, 395 P.3d 429 (2017); *State v. Hill*, 271 Kan. 929, 934, 26 P.3d 1267 (2001), *abrogated on other grounds by State v. Voyles*, 284 Kan. 239, 160 P.3d 794 (2007).

"Structural errors 'are so intrinsically harmful as to require automatic reversal (i.e., "affect substantial rights") without regard to their effect on the outcome.' *Neder v. United States*, 527 U.S. 1, 7, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)." *Hill*, 271 Kan. at 934. "Errors are structural when they defy harmless-error analysis because they affect the framework within which the trial proceeds." *State v. Johnson*, 53 Kan. App. 2d 734, 737, 391 P.3d 711, *rev. granted* 306 Kan. 1325 (2017). But only a few constitutional errors have been found as structural, such as the total deprivation of counsel, the lack of an impartial judge, the denial of a right to self-representation, the violation of a right to a public trial, and an erroneous reasonable doubt instruction. 53 Kan. App. 2d at 736; see *United States v. Marcus*, 560 U.S. 258, 263, 130 S. Ct. 2159, 176 L. Ed. 2d 1012 (2010).

Copeland argues the district court committed a structural error when it failed to hold a hearing on the parties' motion to strike his jury trial from the docket because this

16

court's review of the issue will only amount to a speculative inquiry. But it is clear from our discussion of the above cases that the Kansas Supreme Court has never viewed a violation of the defendant's right to be present at a continuance hearing as structural error, even though the error amounts to a violation of the defendant's constitutional right to be present at all critical stages. In fact, in every case in which our Supreme Court has addressed this issue, the court ultimately found the error to be harmless.

We reject Copeland's claim that the district court committed structural error by granting a trial continuance outside of his presence without holding a hearing. While the district court erred in violating Copeland's right to be present at all critical stages, the error does not affect the entire framework of the trial so as to constitute structural error. Like most trial errors, we must analyze whether the violation of Copeland's right requires us to reverse his convictions rather than being harmless.

*Harmless error analysis*

Because the district court's error was not structural, a harmless error analysis is appropriate. As we have stated, to find a constitutional error harmless, the appellate court must be persuaded beyond a reasonable doubt that there was no impact on the trial's outcome, i.e., there is no reasonable possibility that the error contributed to the verdict. *Salary*, 301 Kan. at 607. As the party benefitting from the error, the State bears the burden of proving the error was harmless. 301 Kan. at 607.

The record is clear that Copeland has never asserted a violation of his constitutional right to a speedy trial. The only prejudice he asserts from the violation of his right to be present is a possible violation of his statutory speedy trial right. But Copeland's claim differs from the defendants' claims in *Brownlee*, *Dupree*, and *Wright* because Copeland does not specifically assert that the district court's November 2013 trial continuance extended the speedy trial clock beyond the statutory deadline.

17

Here, in November 2013, the district court granted a trial continuance outside of Copeland's presence without holding a hearing. The trial continuance was from January 6, 2014, to May 12, 2014. Copeland was not in custody when the trial continuance was granted. But on March 28, 2014, the State successfully argued a motion to revoke Copeland's bond, and Copeland was placed back in custody on April 1, 2014. He remained in custody until his trial began on July 10, 2014, and he was also facing a charge in Chautauqua County case No. 14CR18 for violating a protection order.

Although Copeland asserted a statutory speedy trial claim in district court, he did not expressly argue that the district court's November 2013 order violated his speedy trial right. While this appeal was pending, this court granted a joint request to remand to the district court to reconstruct a hearing held on July 7, 2014, addressing Copeland's motion to dismiss. But Copeland did not request a remand for additional factual findings about the November 2013 continuance order, nor does he ask for a remand now. He simply argues that the violation of his right to be present was structural error.

The district court's November 2013 order granted a continuance "by agreement of the parties" and temporarily removed the trial from the court's calendar. Copeland was being held on another charge for part of that time, so any delay after he was being held on multiple charges could not have violated the speedy trial statute. See K.S.A. 2017 Supp. 22-3402(a). But even if we assume that the November 2013 trial continuance extended the speedy trial clock beyond the statutory deadline, and even if we also assume that the district court would have assessed the continuance solely to the State had Copeland been present to object, he still faces the obstacle caused by K.S.A. 2017 Supp. 22-3402(g).

As we have discussed, K.S.A. 2017 Supp. 22-3402(g) provides that if a delay initially attributed to the defendant is later charged to the State for any reason, such delay shall not be used as a ground for dismissing a case or for reversing a conviction unless the delay would result in a violation of the constitutional right to a speedy trial or there is

18

prosecutorial misconduct related to the delay. Copeland is not claiming a constitutional speedy trial violation, nor is he claiming prosecutorial misconduct related to the delay. He is asking us to reverse his convictions for the violation of his right to be present when his trial was continued in November 2013, and the only prejudice he asserts from that violation is that the trial delay initially attributed him, in part, should have been charged solely to the State. That is the precise remedy the statute now bars.

We understand that the State bears the burden of proving any error was harmless. *Salary*, 301 Kan. at 607. But based on the claims Copeland is asserting and the record before us in this case, we find that he is not entitled to a reversal of his convictions based on the violation of his right to be present when his trial continuance was granted. We cannot discern any reason to remand this case to the district court for additional factual findings on this issue. Thus, we conclude that the district court's error in granting a trial continuance outside of Copeland's presence was harmless.

ERROR IN INSTRUCTING JURY

Finally, Copeland argues that the district court erred in instructing the jury that it could find him guilty of the crimes if the State proved he committed one element of the crimes. Copeland asserts that the error requires automatic reversal as structural error because it lowered the State's burden to prove him guilty beyond a reasonable doubt.

Typically, this court reviews jury instructional errors under a four-step approach:

"'"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the

19

appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012)."' [Citation omitted.]" *State v. Fisher*, 304 Kan. 242, 256-57, 373 P.3d 781 (2016).

Copeland concedes that he did not object to the district court's culpable mental state instruction that he now challenges as erroneous on appeal. Due to his failure to object, this court will review the alleged error—if the error is not found structural—under the clearly erroneous standard. See K.S.A. 2017 Supp. 22-3414(3); *State v. Brown*, 306 Kan. 1145, 1164, 401 P.3d 611 (2017). The clearly erroneous standard is a two-step review which requires "[this court to] first determine whether the instructions were legally and factually appropriate, employing an unlimited review of the entire record. If error is found, 'the defendant must firmly convince the court the jury would have reached a different result without the error.' [Citations omitted.]" 306 Kan. at 1164.

Copeland argues that the district court diluted the State's burden of proof based on the following jury instruction:

"Instruction No. 21
"*The State must prove that the defendant committed one element of the crime of* manufacture of methamphetamine, possession of ephedrine, possession of lithium, possession of coffee filters, Coleman camp fuel and a gas generator, possessed methamphetamine, possessed hydrocodone, possessed marijuana, and possessed paraphernalia.
"A defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about by the State.
"*The State must prove that the defendant knowingly committed one element of the crime of* aggravated assault with a deadly weapon (gun), domestic battery, possessed an Uzi submachine gun, possessed an AR-15 rifle, possessed a Springfield 1911 pistol, and possessed a .22 pistol.

20

"A defendant acts knowingly when the defendant is aware of the nature of his conduct that the State complains about, the circumstances in which he was acting, and that his conduct was reasonably certain to cause the result complained about by the State." (Emphases added.)

PIK Crim. 4th 52.010 (2012 ed.) used at Copeland's trial provides, in part:

"The State must prove that the defendant committed [one element of] the crime *insert one of the following*:
- "intentionally."
  "or
- "knowingly.
  "or
- "recklessly."

It appears that the district committed a clerical error in preparing Instruction No. 21 for the jury. In the first paragraph of Instruction No. 21, the district court failed to delete the bracketed words "one element of" and the court also failed to insert "intentionally" as the appropriate culpable mental state. Yet the district court defined the term "intentionally" in the very next paragraph. Likewise, the court failed to delete the bracketed words "one element of" in the third paragraph of Instruction No. 21, but it did insert and define the term "knowingly" as the appropriate culpable mental state. Apparently no one noticed the errors because neither party objected to the instruction.

Instruction No. 21 is not legally appropriate. The State concedes the first sentence in Instruction No. 21 is not legally appropriate because it omits the word "intentionally." More importantly, the instruction incorrectly directed the jury that the State must prove only one element of the crimes charged.

Copeland argues that the error in Instruction No. 21 was structural. As stated above, this court's analysis of whether an error is structural or whether it may instead be

21

declared harmless is a question of law over which appellate courts have unlimited review. *McDaniel*, 306 Kan. at 600; *Hill*, 271 Kan. at 934. Structural errors "affect the framework within which the trial proceeds." *Johnson*, 53 Kan. App. 2d at 737. As applied to jury instructions, only a misstatement of the State's burden of proof has been held to be a structural error. *Sullivan v. Louisiana*, 508 U.S. 275, 281-82, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993); *Miller v. State*, 298 Kan. 921, 938-39, 318 P.3d 155 (2014). Other jury instruction errors, such as omitting an element of the charged crimes from the jury instructions, are subject to a harmless error standard. See *Neder*, 527 U.S. at 9-10.

In *Miller*, the petitioner complained that his appellate counsel provided ineffective assistance of counsel in failing to challenge an erroneous reasonable doubt instruction. The Kansas Supreme Court agreed and explained:

> "The incorrect written jury instruction at issue read: 'If you have a reasonable doubt as to the truth of *each* of the claims required to be proved by the State, you must find the defendant not guilty.' The word 'each' was substituted for 'any' in what was the standard PIK jury instruction at that time. See PIK Crim. 3d 52.02 (2004 Supp.). This substitution effectively told the jury it could acquit Miller only if it had a reasonable doubt as to all of the elements the State was required to prove—rather than acquitting him if it had a reasonable doubt as to any single element. As admitted by the State, the written instruction was plainly wrong." 298 Kan. at 923.

Copeland argues Instruction No. 21 diluted the State's burden of proof because "a literal understanding of the erroneous . . . instruction directed the jury to find [Copeland] guilty if it had no reasonable doubt as to the truth on *one element* of each charged offense." Copeland's argument has merit when Instruction No. 21 is read in isolation. But appellate courts must examine "'jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury.' [Citations omitted.]" *State v. Mattox*, 305 Kan. 1015, 1020, 390 P.3d 514 (2017).

22

Copeland concedes the district court properly instructed the jury using the individual elements instruction for each applicable charge. Each elements instruction told the jury: "To establish this charge, each of the following claims must be proved" and listed the elements the State had to prove. Likewise, Copeland does not argue that the reasonable doubt instruction—on its own—is erroneous, and the district court here properly instructed the jury on burden of proof as follows:

> "Instruction No. 23
>
> "The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty unless you are convinced from the evidence that he is guilty.
>
> "The test you must use in determining whether the defendant is guilty or not guilty is this: *If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State*, you must find the defendant not guilty. *If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State*, you should find the defendant guilty." (Emphases added.)

Significantly, the error here is distinguishable from the structural error in *Miller* where the actual reasonable doubt instruction unconstitutionally defined the State's burden to prove the crime beyond a reasonable doubt. The error in the reasonable doubt instruction in *Miller* tainted the entire set of instructions given to the jury to the extent that the instructions as a whole did not fairly and properly state the applicable law on the State's burden of proof. Here, the reasonable doubt instruction, as well as the elements instruction for each individual charge, properly instructed the jury that the State must prove each of the claims asserted by the State beyond a reasonable doubt.

The parties' closing arguments provide additional support that the jury was properly instructed on the State's burden of proof. The State explained during closing argument that it needed to prove all the elements of the charges. During closing, the State reviewed each charge and discussed the evidence that supported the particular elements

23

of each charge. The defense counsel also reviewed the burden of proof instruction in closing arguments, stating: "The burden of proof is applicable to each and every element of the claim that comprises the charge." Defense counsel also reviewed the reasonable doubt test with the jury. Finally, in rebuttal closing, the State also stated that, based on the evidence, it had proven every element of the case.

Based on a review of the instructions as whole and the parties' closing arguments, the jury was properly instructed on the State's burden of proof beyond a reasonable doubt. The jury instructions as a whole did not dilute the State's burden to prove Copeland guilty beyond a reasonable doubt to the extent that it affected the entire framework of the trial. We conclude that the error in Instruction No. 21 does not constitute structural error.

Copeland has not argued that his convictions require reversal under the clear error standard. We find there was no clear error for the same reasons that we find there was no structural error. Moreover, the evidence supporting the charges against Copeland was substantial. Copeland does not firmly convince us that the jury would have reached a different result with a proper culpable mental state instruction. Instruction No. 21 along with the jury instructions as a whole were not clearly erroneous.

Affirmed.