NOT DESIGNATED FOR PUBLICATION

No. 115,229

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

PETTIX MCMILLAN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JAMES R. FLEETWOOD, judge. Opinion on remand filed February 19, 2021. Convictions affirmed, sentences vacated, and case remanded with directions.

*Caroline M. Zuschek*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, appellee.

Before POWELL, P.J., MALONE and ATCHESON, JJ.

ATCHESON, J.: Defendant Pettix McMillan's appeal of three convictions for attempted first-degree murder in the shooting of his then-wife and two of their children returns to us after the Sedgwick County District Court held an evidentiary hearing on his claim that his constitutional right to due process was violated in a way that compromised his statutory right to a speedy trial. The district court made findings of fact and conclusions of law rejecting the claim because the State could have tried the case within the speedy trial time using the same core evidence the jurors heard when they convicted McMillan in the first place. As a result, any due process violations premised on

1

McMillan's inability to personally object when his lawyers requested and received trial continuances caused no legal prejudice and were, therefore, harmless. We see no error in the district court's ruling; so we again affirm McMillan's convictions.

In his appeal from the district court's decision, McMillan raises an unrelated challenge to his sentence. Although the sentencing issue exceeds the scope of our remand order to the district court and its review of the case, we take up the point, since defendants may at any time attack sentences they continue to serve. See K.S.A. 2020 Supp. 22-3504(a). McMillan contends the district court imposed an illegal sentence of 1,068 months when the maximum lawful prison term could not exceed 1,029 months. The State concedes error. We have made an independent review of the governing statutes and agree. On this point, we vacate McMillan's sentences and remand for resentencing consistent with this opinion.

CASE HISTORY

*Underlying Crime, Trial, and Sentencing*

When McMillan shot his wife Maria McMillan, their 13-year-old son M.M., and their 5-year-old son K.M. in late March 2014, their marriage had frayed to the breaking point. He had moved out of the home much earlier, and they had a series of verbal and physical altercations. The McMillans have a third son P.M. who was not home at the time of the shooting. Maria's father Jorge Gonzales resided there and saw much of the incident.[*]

[*]Gonzales' last name appears in the record as both "Gonzales" and "Gonzalez." We use "Gonzales" consistent with how his name is rendered in the record when he testified during the trial. We also refer to Maria McMillan by her first name, not as some inadvertent and inappropriate informality, but to clearly differentiate between her and Pettix McMillan. By the time of the trial, Maria had divorced McMillan but retained the McMillan name.

2

Just before the shooting, McMillan arrived at the house angry. He confronted Maria in the garage and shot her with a pistol. He then went inside and shot M.M. and K.M. McMillan immediately left. Gonzales and M.M. were able to make their way to neighboring houses. One of the neighbors called 911. Police officers and emergency medical personnel arrived promptly. The police arrested McMillan shortly afterward in the vicinity. McMillan exercised his right to remain silent and spoke with neither the arresting officers nor a detective later. Officers photographed and otherwise documented the crime scene and the victims' injuries. Among other evidence, they collected the shell casings ejected from McMillan's pistol during the shooting, but no one ever found the handgun.

As the charges against McMillan and our narrative indicate, Maria, M.M., and K.M. survived their injuries. The State charged McMillan with three counts of attempted first-degree murder, a severity level 1 person felony. See K.S.A. 2013 Supp. 21-5301(c)(1) (attempt to commit off-grid felony punished as severity level 1 felony); K.S.A. 2013 Supp. 21-5402(b) (first-degree murder off-grid felony). McMillan was bound over for trial on those charges following a preliminary hearing at which Maria, M.M., and Gonzales testified. He went through a series of appointed lawyers leading up to the trial in mid-June 2015.

During the trial, Maria and M.M. told the jurors McMillan shot them. Gonzales testified that he saw McMillan shoot Maria, heard the shots that injured his grandsons, and went to a neighbor's house to get help. Their testimony formed the core of the State's case and established the requisite elements of the attempted first-degree murder charges. Given K.M.'s age, the prosecutors decided not to call him as a witness. Various law enforcement officers, crime scene investigators, and medical personnel also testified to the aftermath of the shooting. McMillan offered a defense of a voluntary intoxication relying on the testimony of two acquaintances with whom he had been drinking the day

3

of the incident. He did not testify in his own defense. The jury convicted McMillan as charged and found aggravating factors permitting enhanced sentences for the attempted murders of M.M. and K.M. based on their ages and the familial relationship. See K.S.A. 2013 Supp. 21-6815(c)(2).

Identity was never seriously in issue. The State did not have or need scientific evidence, such as DNA testing, to establish or bolster the identification of the perpetrator. Likewise, the case did not involve a diminished capacity defense apart from McMillan's claimed intoxication, so no psychiatrists or psychologists had to develop clinical profiles of and expert opinions on his mental status or capacity.

At a posttrial hearing, the district court imposed a controlling term of imprisonment of 1,068 months on McMillan by applying the aggravating factors the jury found and ordering the sentences to be served consecutively. We defer further discussion of the mechanics behind the sentence and the district court's error, since McMillan has challenged the duration of his incarceration.

After his conviction and sentencing, McMillan filed an appeal. McMillan raised two interlocking points bearing on his statutory right to a speedy trial under K.S.A. 2013 Supp. 22-3402. He also disputed the criminal history category the district court used to determine his sentence. We affirmed in all respects in an unpublished opinion filed in August 2017. *State v. McMillan*, No. 115,229, 2017 WL 3447000, at *1 (Kan. App. 2017) (unpublished opinion) (*McMillan I*), *vacated in part and remanded by Supreme Court order filed* April 30, 2018. As we explain, the Kansas Supreme Court remanded the case to us for reconsideration of one aspect of the speedy trial issue, and we remanded to the district court.

*Speedy Trial and Due Process Issues in* McMillan I

In *McMillan I*, McMillan reprised the statutory speedy trial challenge he unsuccessfully asserted in the district court before his trial. As we indicated, from the start of the case, four court-appointed lawyers serially represented McMillan and withdrew for various reasons. In *McMillan I*, we outlined the trial continuances they requested and received. 2017 WL 3447000, at *2. Those continuances were not charged against the 150-day time limit for bringing a defendant in custody to trial. See K.S.A. 2020 Supp. 22-3402(a). McMillan was not present when the lawyers got those continuances, so he had no opportunity to voice an objection. Another appointed lawyer represented McMillan leading up to and during the trial.

McMillan drafted and filed his own motion asserting a violation of his statutory speedy trial rights because the trial had been continued without his approval beyond the 150-day limit. He also argued that he had been denied his right to due process under the Fourteenth Amendment to the United States Constitution because he was not personally present at the hearings on the continuances and could not voice his objection to them. McMillan's trial lawyer represented him at the district court hearing on his speedy trial motion. McMillan and three of the four lawyers who had represented him testified. The district court found no violation of the speedy trial statute and never ruled on McMillan's due process claim. At the hearing, however, the lawyers neither developed testimony bearing directly on the due process issue nor directly argued it to the district court.

On the statutory speedy trial claim itself, we affirmed the district court because the statute provides that if a continuance has been attributed to the defendant and thus does not count against the 150-day period, the attribution cannot be changed later even though it may have been erroneous in the first place. *McMillan I*, 2017 WL 3447000, at *3-4. We relied on the statutory language in K.S.A. 2016 Supp. 22-3402(g), as construed in *State v. Brownlee*, 302 Kan. 491, 510-11, 354 P.3d 525 (2015), in reaching our conclusion.

5

As to the due process claim, we recognized that McMillan had a constitutional right to be present at all critical stages of the case against him and that right encompassed hearings on trial continuances. *McMillan I*, 2017 WL 3447000, at *4; see *State v. McDaniel*, 306 Kan. 595, Syl. ¶¶ 1-2, 395 P.3d 429 (2017); see also *State v. James*, 309 Kan. 1280, Syl. ¶ 5, 443 P.3d 1063 (2019) (confirming hearing on trial continuance as critical stage of prosecution). The Kansas Supreme Court has held that if a criminal defendant personally objects to a trial continuance his or her lawyer has requested, the district court may not grant the continuance. *State v. Dupree*, 304 Kan. 43, 49, 371 P.3d 862 (2016) ("We have recognized for speedy trial purposes that an attorney cannot continue a case over a defendant's objection.").

At the hearing on the speedy trial motion, the lawyers testified they neither consulted with nor sought approval from McMillan for the continuances they obtained. McMillan confirmed as much in his testimony and further testified he told the last of the lawyers he wanted no more trial continuances. McMillan was never asked if he made similar statements to the other lawyers or if he would have personally objected to the continuances if he had been present when the lawyers requested them. Faced with that ambiguity in the record, we assumed McMillan would have objected and the continuances would have been denied. *McMillan I*, 2017 WL 3447000, at *4.

The State, of course, could have requested trial continuances so long as McMillan were tried within 150 days. Accordingly, the due process violations in not having McMillan present at the hearings on the continuances—so he could object and, thus, prevent the delays—would have been harmless if the State could have tried him within the 150-day period using substantially the same evidence it presented at the trial that resulted in his convictions. In other words, if the State could have honored a personal demand from McMillan for a speedy trial and presented the same essential case, his inability to make the demand caused him no legal prejudice and, therefore, requires no

6

remedy now. The Kansas Supreme Court has endorsed that harmless error analysis for the type of due process claim McMillan has asserted here linked to his statutory speedy trial rights. *James*, 309 Kan. at 1310-11; *State v. Wright*, 307 Kan. 449, 458, 410 P.3d 893 (2018) (*Wright II*); *State v. Wright*, 305 Kan. 1176, 1179, 390 P.3d 899 (2017) (*Wright I*).

In *McMillan I*, we had the benefit of *Wright I*. Having assumed McMillan would have objected to the trial continuances, we considered whether the State could have successfully tried him within the speedy trial time—rendering the due process violation harmless. We examined the trial record and concluded the case effectively rested on the testimony of Maria, M.M., and Gonzales weighed against a weak intoxication defense. Given that conclusion, we held that the State would have presented the same strong case and would have convicted McMillan if it had been required to go to trial within the speedy trial time. We, therefore, affirmed McMillan's convictions. 2017 WL 3447000, at *1, 4.

In a petition for review to the Kansas Supreme Court, McMillan argued we erred in finding no statutory speedy trial violation and in finding the due process violation to be harmless. In a two-paragraph order filed on April 20, 2018, the court granted the petition as to only the due process issue, vacated that portion of *McMillan I*, and remanded to us for further proceedings in light of *Wright II*, 307 Kan. at 456. The court's order effectively affirmed our determination that McMillan's statutory right to a speedy trial had not been violated. And that is now law of the case. See *State v. Collier*, 263 Kan. 629, Syl. ¶ 3, 952 P.2d 1326 (1998). Taking a cue from the handling of *Wright I* and *Wright II*, we inferred the court faulted us for declaring the due process violation harmless from the trial record alone. We, therefore, remanded to the district court for an evidentiary hearing aimed at determining whether the case against McMillan would have been substantially the same if it had been tried within the statutory speedy trial time rather than roughly nine months later.

*Due Process Issue on Remand*

In our remand order to the district court filed on May 17, 2018, we narrowed the issues to be considered. We directed the district court to make two factual assumptions: (1) McMillan would have objected to the five continuances his lawyers requested and received that extended the trial beyond the 150-day speedy trial period; and (2) the continuances would not have been granted over those objections. We then stated the evidentiary hearing should focus on "whether the State could have brought McMillan to trial within the speedy trial time set under K.S.A. 22-3402" and on evidence the State would have had available then. We also invited the parties and the district court to consider "[a]ny other matters relevant to whether the State could have tried and convicted McMillan." Based on those determinations, the district court was to assess whether McMillan would have been convicted in a trial satisfying the speedy trial time constraints.

The district court appointed a new lawyer for McMillan and held the evidentiary hearing in September 2018 and filed findings of fact and conclusions of law in April 2019. At the hearing, the two prosecutors who conducted the trial testified as to their preparation of the case, the key evidence, and the availability of witnesses through the second week of November 2014, when the speedy trial time would have run. Maria testified that she, the three children, and Gonzales were all in Wichita and would have been available to testify in 2014. The lead detective coordinating the case investigation also testified, covering some of the same ground and verifying the availability of Wichita Police Department personnel based on his review of various departmental records. McMillan did not testify. He presumably had no knowledge about the availability of the witnesses and other evidence for trial. And the directions in the remand order removed any possible dispute over McMillan's opposition to the trial continuances as an issue at the hearing.

8

In its written ruling, the district court found the State would have presented substantially the same witnesses and evidence in a trial held within the speedy trial time as it did during the actual jury trial. The district court made a specific finding that Maria, M.M., K.M., and Gonzales would have been available to testify. The district court, therefore, concluded McMillan would have been convicted of the three counts of attempted first-degree murder. McMillan has appealed the district court's ruling, and that is what we now have in front of us.

LEGAL ANALYSIS

*Due Process Issue*

In this appeal, McMillan challenges the district court's determination the evidence would have been sufficiently similar in a trial held within the speedy trial time and, in turn, the conclusion he would have been convicted. He raises two specific points. First, McMillan says the hearing record on remand fails to establish that Justin Rankin, a civilian employee of the Sedgwick County Regional Forensic Science Center, would have been available as an expert witness to testify about the shell casings. As we explain and as the district court found, Rankin's testimony was, at best, peripheral in establishing McMillan's guilt, so his unavailability at trial would have made no difference in the outcome. Second, McMillan says Maria was not credible as to when she, her children, and her father were available as witnesses. Again, as we explain, that argument fails.

The ultimate issue here is the legal effect of the due process violations resulting from McMillan's absence at the hearings at which his lawyers obtained continuances of the trial beyond the speedy trial deadline. The burden falls on the State to establish the violations were harmless. Because the violations compromised a criminal defendant's constitutional right to due process, the State must show beyond a reasonable doubt the

9

outcome would have been the same had there been no violations. See *James*, 309 Kan. at 1309; *Wright I*, 305 Kan. at 1179. Here, that means showing McMillan would have been convicted in a trial held within the speedy trial time.

The parties agree that the established bifurcated standard of appellate review governs the district court's findings of fact and conclusions of law. We ask whether the findings have substantial support in the record, deferring to the district court's resolution of conflicting evidence and assessment of witness credibility. We then consider whether those findings warrant the legal conclusions and the ultimate ruling without affording any particular deference to the district court. *State v. Gilliland*, 294 Kan. 519, Syl. ¶ 1, 276 P.3d 165 (2012); *State v. Fernandez-Torres*, 50 Kan. App. 2d 1069, 1076, 337 P.3d 691 (2014).

The district court concluded the statutory speedy trial deadline would have been November 10, 2014, if the defense had taken no continuances. The parties do not dispute that determination. Nor do we.

McMillan contends the State failed to present evidence at the hearing on remand to establish that Rankin would have been available to testify at a trial held on or before November 10. As we have indicated, Rankin did not testify at the hearing. One of the prosecutors testified she understood Rankin would have been available based on what he had told her. McMillan objected to the testimony as hearsay—an objection we find to be well-taken. The State offered no other evidence at the hearing on Rankin's availability.

Rankin is an expert in firearms comparison and tool marks. At McMillan's trial, he examined the shell casings that crime scene investigators collected from the residence after the shooting. In turn, he compared them to a shell casing another officer retrieved from the residence in late January 2014, about two months before the shooting. In January 2014, McMillan showed up at the house and argued loudly with Maria. He

brandished a pistol and fired a single shot at that time. Based on his examination of the shell casings from January and March, Rankin testified they came from the same gun. Maria and Gonzales also testified at trial about the confrontation with McMillan in January, which the State offered as other crimes evidence under K.S.A. 60-455. McMillan has not disputed the admissibility of the January incident as trial evidence.

Rankin's testimony tended to prove the pistol McMillan fired in the January confrontation with Maria was the same one he then used to shoot her and the children in March. While that may be interesting in the manner of a factoid, it seems at best only nominally relevant to any genuine issue in McMillan's trial for attempted murder. There was no question about the instrumentality of injury here; the victims testified they had been shot. The shell casings and the nature of their wounds confirmed their testimony. McMillan's discharge of a handgun—indisputably a lethal weapon—at close range is circumstantial evidence of an intent to kill, especially since shots struck both M.M. and K.M. in the head. See *State v. Greenwood*, 197 Kan. 676, 686, 421 P.2d 24 (1966); *People v. Hernandez*, 257 A.D.2d 664, 665, 684 N.Y.S. 2d 573 (1999); *State v. Cromartie*, 177 N.C. App. 73, 77, 627 S.E.2d 677 (2006) ("Where the defendant points a gun at the victim and pulls the trigger, this constitutes evidence from which intent to kill may be inferred."). What specific gun McMillan may have used is beside the point.

The district court concluded that Rankin's testimony or more precisely its absence "would not have affected the outcome of the trial" given the totality of the remaining evidence and in particular the eyewitness accounts from Maria, M.M., and Gonzales. We share that view whether it's treated as a finding of fact or a conclusion of law. In turn, McMillan's contention fails.

McMillan next argues Maria was not a reliable witness at the hearing on remand as to her availability and the availability of her children and father as witnesses leading up to the speedy trial deadline in November 2014. The foundation for the argument

11

seems to be testimony from one of the prosecutors that he was concerned Gonzales might be traveling, possibly to Mexico, and would be unavailable for trial. The prosecutor tied his concern to "information from Maria" that Gonzales traveled outside Kansas from time to time. As we have indicated, Maria was unequivocal in her testimony that she and her family members were available in 2014. She testified that Gonzales sometimes went to California but had not traveled in 2014 after the shooting.

McMillan's argument falters for two reasons. First, the district court expressly found that Maria, M.M., K.M., and Gonzales were in Wichita and available to testify through the speedy trial deadline. The finding mirrors Maria's testimony and entails an implicit finding she was a credible witness in that respect. See *State v. Horn*, No. 118,930, 2019 WL 3047354, at *2 (Kan. App. 2019) (unpublished opinion) (district court's factual findings in memorandum decision "track[ing]" testimony from particular witness "necessarily reflect an implicit credibility determination" favoring that witness); *State v. Cheatham*, No. 106,413, 2012 WL 4678522, at *2 (Kan. App. 2012) (unpublished opinion) (appellate court infers credibility determination from district court's factual findings comporting with one witness' account of relevant events rather than conflicting account from second witness). We will not disturb the district court's credibility determination. In turn, the finding has more than sufficient support in the record, and it undercuts McMillan's argument on appeal.

Moreover, the State could have gone to trial within the speedy trial time even if Maria, M.M., or Gonzales turned out to be unavailable. Each of them testified at the preliminary hearing, and the evidence produced was sufficient to support the attempted first-degree murder charges. The State could have substituted that testimony for an in-person appearance at trial if any or all of them were then unavailable. See *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); *State v. Reed*, 302 Kan. 227, 246, 352 P.3d 530 (2015). If the State had to rely on testimony from the preliminary hearing, the jury would have been instructed to weigh that testimony by the

same standards as testimony from witnesses appearing in person. See PIK Crim. 4th 51.070. In turn, we presume juries follow the instructions they are given. *State v. Mattox*, 305 Kan. 1015, 1027, 390 P.3d 514 (2017).

We are not disposed to say that as a legal matter the State would have been disadvantaged as a result. Conventional wisdom, of course, certainly posits that jurors are more receptive and responsive to testimony from an in-person witness than a rendering from a transcript. But that is more a matter of theatrical effect than legal rule. In any event, McMillan makes no headway with his argument premised on Maria's lack of credibility.

Finally, we mention that notwithstanding our invitation in the remand order McMillan has never suggested his defense would have been different or better had he gone to trial sooner. In sum, we have no hesitancy in concluding McMillan would have been convicted of the three counts of attempted first-degree murder had the trial taken place sometime before November 10, 2014.

*Illegal Sentence Issue*

In this appeal, McMillan has made a new claim his sentence is illegal. A sentence is illegal if it does not conform to the governing statutes. K.S.A. 2020 Supp. 22-3504(c)(1). We now explore the claim and ultimately share the parties' conclusion the aggregate prison term of 1,068 months exceeds the statutory maximum and must be set aside.

As we have indicated, the jury found aggravating factors in the shooting of K.M. and M.M., given their ages and familial relationship to McMillan. Relying on those findings, the district court doubled the presumptive guidelines sentences for those convictions. See K.S.A. 2013 Supp. 21-6818(b)(2). The district court followed the

13

prosecutors' suggestion that the maximum permissible term of incarceration under the guidelines would be then 1,068 months, taking into account the aggravating factors on two of the three convictions and ordering consecutive sentences. The prosecutors, however, did not explain in detail how they arrived at that number as the controlling term, and the district court offered no explanation in pronouncing the punishment.

The State now concedes the sentencing error and agrees with McMillan that the consecutive sentences on the three convictions could not exceed 1,029 months. We have reviewed the controlling statutes and agree.

McMillan has a criminal history score of D because of a felony conviction from California. He does not now dispute his criminal history, although he unsuccessfully challenged it in *McMillan I*. As a severity level 1 felony, attempted first-degree murder had a presumptive guidelines sentence of between 240 and 267 months in 2014 for a defendant with a criminal history score of D. K.S.A. 2013 Supp. 21-6804(a). (It still does, but we formally apply the sentences in effect when a defendant commits a crime. See *Cooper v. Werholtz*, 277 Kan. 250, Syl. ¶ 1, 83 P.3d 1212 [2004].) Because this case involved multiple crimes, one of the convictions became the "primary crime" and established the "base sentence." The base sentence is drawn from the sentencing grid using the defendant's criminal history and the severity level of the crime. K.S.A. 2013 Supp. 21-6819(b). Here, the district court must have selected 267 months—the longest presumptive sentence—for the primary crime. Given the jury's special findings, the district court could double the sentence to 534 months, which it clearly intended to do in sentencing McMillan.

McMillan's sentencing apparently went awry because the prosecutors and the district court misapplied K.S.A. 2013 Supp. 21-6819(b)(4) that caps the aggregate term of imprisonment in a case with multiple convictions at double the base sentence regardless of the number of convictions or the individual sentences imposed for each conviction.

14

Here, that would be twice the aggravated sentence for the primary crime or 1,068 months. Regardless of the cap, the sentences for each conviction must be determined in conformity with sentencing guidelines. And the resulting term of imprisonment based on those sentences controls if it does not exceed the cap set under K.S.A. 2013 Supp. 21-6819(b)(4).

McMillan, therefore, properly received a 534-month sentence on the primary crime (one of the convictions on which the jury found aggravating circumstances). In a multiple convictions case, the sentences for the convictions other than the primary crime are determined from the sentencing grid without considering the defendant's criminal history, effectively placing the defendant in the lowest category. See K.S.A. 2013 Supp. 21-6819(b)(5). For attempted first-degree murder, the presumptive guidelines range for that purpose in 2014 was 147 to 165 months. So the district court could double that sentence for the other conviction on which the jury found aggravating circumstances, resulting in a prison term of up to 330 months. On the remaining conviction for shooting Maria, the maximum sentence would be the top guidelines punishment of 165 months. McMillan's maximum controlling term of imprisonment properly would be the sum of the sentences on the three convictions: 534 months on the primary crime plus 330 months on the other conviction with aggravating factors plus 165 months on the third conviction, yielding a total of 1,029 months.

As McMillan tacitly acknowledges in presenting his argument, the district court clearly intended to impose the longest term of imprisonment permitted under the guidelines. We conclude the transcript of the sentencing hearing can be read no other way. Nonetheless, the controlling term of 1,068 months the district court sought to impose does not conform to the sentencing guidelines and is illegal. As the parties now agree, a sentence of 1,029 would be lawful. We, therefore, vacate McMillan's sentence and remand with directions that the district court resentence McMillan consistent with this opinion.

*Conclusion*

Despite the convoluted procedural journey this case has taken, the bottom line is this: McMillan faced compelling evidence of his guilt from the outset of the prosecution, and he marshalled a limited defense. As the hearing on remand established, McMillan would have been tried and convicted within the statutory speedy trial time had his lawyers not requested continuances or had the continuances been denied because of his personal objections to them. Accordingly, any violation of McMillan's due process rights because he could not voice those objections was harmless. We, therefore, affirm his three convictions for attempted first-degree murder.

McMillan, however, has shown his aggregate term of incarceration of 1,068 months is illegal. The maximum permissible term would be 1,029 months. We, therefore, vacate McMillan's sentences and remand to the district court for resentencing.

Convictions affirmed, sentences vacated, and case remanded to the district court with directions to resentence McMillan.